On June 27, 1997, 16-year-old Jason Lamar Stough severed his right thumb while working at B B Pallet Repair, Inc. ("B B"). B B is owned by its president and sole officer, Benny Boykin. Jason, acting through his father and next friend, David Stough, sued B B and Boykin on April 10, 1998, alleging various claims that can be generally divided into two categories.
Jason's first category of claims all proceeded on the assertion that the Alabama Workers' Compensation Act, § 25-5-1 et seq., Ala. Code 1975 ("the Act"), does not apply to the injuries he suffered in this case. This group of claims alleged (1) that the defendants negligently or wantonly failed to provide Jason with a reasonably safe place to work, in violation of § 25-1-1(a), Ala. Code 1975; (2) that the defendants, as employers, negligently or wantonly breached their statutory duties to Jason as set out in § 25-1-1(b), Ala. Code 1975; (3) that the defendants negligently or wantonly breached a common-law duty to provide Jason with a safe workplace, and (4) that the defendants were liable for Jason's injuries because, he said, they had violated the requirements of § 25-6-1, Ala. Code 1975, governing defective machinery at the workplace and requiring proper instruction *Page 194 
for employees on the safe operation of workplace machinery.
Jason's second category of claims contained alternative counts that can proceed only if the Act applies to Jason's injuries. These claims (1) claimed workers' compensation benefits for Jason from B B and (2) asserted a co-employee claim against Boykin pursuant to § 25-5-11, Ala. Code 1975.
In their answers to Jason's claims, the defendants admitted that Jason was a minor at the time of his injury and that he was injured in the line and scope of his employment with B B. On January 18, 1999, the defendants moved for a partial summary judgment as to all of Jason's claims except his claim against B B seeking workers' compensation benefits, Count VI in Jason's complaint. On Sunday, April 11, 1999, the day before trial was scheduled to begin, the trial court entered a partial summary judgment for the defendants on all of Jason's claims except for Count VI. The next day, the trial court attempted to comply with Rule 54(b), Ala.R.Civ.P., and noted that the partial summary judgment was final for the purposes of appeal.
Jason appealed to the Supreme Court of Alabama; that court transferred the appeal to this court, pursuant to § 12-2-7, Ala. Code 1975. This court remanded the case to the trial court for entry of an order complying with Brown v. Whitaker ContractingCorp., 681 So.2d 226 (Ala.Civ.App. 1996), and the trial court entered that order on June 19, 1999.
Jason presents two arguments on appeal: (1) that his claims in the first category are not barred by the exclusivity provisions of the Act because, he says, he was not a legal "employee" of the defendants, and (2) that he cannot be estopped from pursuing his legal remedies under the circumstances of this case. Jason does not appeal the partial summary judgment as it relates to his "co-employee" claim against Boykin.
Jason was born on June 14, 1981. On his 16th birthday, his parents bought him a used Ford pickup truck. In order to pay for gasoline and maintenance on the truck, Jason began looking for work. He found that work at B B, where his older brother, Michael, had worked since 1994. B B's primary business is to buy standard pallets in need of repair, to repair them, and to resell them. During the summer of 1997, B B was repairing approximately 1,000 pallets per day, representing a quota of approximately 200 pallets per employee. The business is located on approximately 6 acres in Elmore County.
The defendants' records show that Jason's first day of work was June 23, 1997; his memory is that he worked approximately a week before he was injured. Jason testified that his job was to be "getting up boards for the people that would be on pallets." Although Jason and his father had understood that Jason's job was going to involve picking up boards and keeping the production yard straight, the job actually required Jason to operate one of B B's two Roto-Shear machines. Both Roto-Shear machines were hydraulically driven devices composed of various clamps and cutting blades that cut though and pulled apart the metal fasteners that held pallets together, effectively dismantling pallets in the machine.
The Roto-Shear machine operated by Jason was the second machine that B B had purchased. Unlike the first machine, a "stand up" machine, this second machine was a "table top" machine. Also unlike the first machine, the second machine did not come with an instruction manual. After using the second machine for some time, Boykin converted the machine from a "table top" machine to a "stand up" machine in order to speed up its operation. Boykin testified that he made the decision as to how the modification would be done and that he did the actual welding to complete the modification. Although Boykin stated that after the modification the second machine was set up and operated in the same manner as the first machine, the *Page 195 
second machine, unlike the first machine, did not have a warning sign stating "keep hands clear." Neither machine had guards that could prevent body parts from touching the blades.
Boykin testified that he had learned to operate the Roto-Shear machines by watching other people operate them, by reading the first machine's instruction manual, and by his common sense. Boykin had shown other employees at B B how to operate the Roto-Shear machines. In describing the operation of the Roto-Shear machines, he testified that the machines sometimes "jam" in the process of dismantling a pallet. A jam occurs when the blades of the machine fail to cut through the pallet material and become wedged into the pallet. Although Boykin had modified the second machine to prevent jams, the machine still jammed on occasion. When a jam occurred, the operator was required to "jiggle" the Roto-Shear blades by using levers on the machine; if jiggling the blades failed to clear the jam, the operator was required to shake the pallet while operating the controls. Jason testified that he had seen this procedure used to free a pallet jammed in the Roto-Shear machine; he also testified that he had seen his brother Michael reach into the machine in order to free a pallet.
When Jason began working at B B, Boykin assigned Jason to the second machine. Jason was to use the machine to dismantle as many pallets as he could. Jason's training on the Roto-Shear machine consisted of watching another employee disassemble a couple of pallets. During the next few days before his injury, Jason also drove forklifts and operated saws and nail guns. He was informed by Boykin that he needed a work permit. According to the defendants' records, Jason had worked less than 40 hours when he was injured, during the afternoon on June 27, 1997. At that time, Jason was operating the second Roto-Shear machine when a pallet became jammed. As he tried to free the pallet, the Roto-Shear blade slid forward and cut off Jason's right thumb at the knuckle.
Jason was hospitalized immediately after his injury, and his thumb was surgically reattached. Although he later required another surgical procedure, he regained sufficient use of his hand to allow him to participate in various high school sports programs, including wrestling in 1997, baseball in the spring of 1998, and football in the fall of 1998. After Jason's injury, the bookkeeper for B B submitted the details of Jason's injury to B B's workers' compensation insurance carrier, and the carrier began sending Jason payments. Jason testified that he had cashed the checks he received and had used the funds as spending money.
In a later deposition, Boykin admitted that he had known that Jason was 16 years old when he hired him and that he had hired Jason to work on the Roto-Shear machine. Boykin also admitted that he was aware that Jason needed a work permit in order to do the work Boykin required on the Roto-Shear machine and that Jason did not have a work permit when he was injured. The record reveals that Boykin was investigated and cited by the United States Department of Labor and the Alabama Child Labor Division with respect to his employment of Jason. Boykin was eventually fined approximately $5,000 as a result of these investigations. Boykin later sold the Roto-Shear machine on which Jason was injured, for $2,000 more than his purchase price.
The record also contains evidence from S. Melville McCarthy, a registered professional engineer who specializes in mechanical engineering. McCarthy testified that the Roto-Shear machine on which Jason was injured was defective because it was improperly safeguarded, and he stated that the regulations of the United States Occupational Safety and Health Administration ("OSHA") require safeguards on machines such as the Roto-Shear. McCarthy further testified that had the proper safeguards been in place, *Page 196 
Jason would not have injured himself while operating the machine. Our standard of review of summary judgments is settled:
 "A motion for summary judgment tests the sufficiency of the evidence. Such a motion is to be granted when the trial court determines that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The moving party bears the burden of negating the existence of a genuine issue of material fact. Furthermore, when a motion for summary judgment is made and supported as provided in Rule 56, [Ala.R.Civ.P.,] the nonmovant may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. Proof by substantial evidence is required."
Sizemore v. Owner-Operator Indep. Drivers Ass'n, Inc.,671 So.2d 674, 675 (Ala.Civ.App. 1995) (citations omitted). Moreover, in determining whether a summary judgment was properly entered, the reviewing court must view the evidence in a light most favorable to the nonmovant. Long v. Jefferson County, 623 So.2d 1130, 1132
(Ala. 1993). No presumption of correctness attaches to a summary judgment, and our review is de novo. Hipps v. Lauderdale CountyBd. of Educ., 631 So.2d 1023, 1025 (Ala.Civ.App. 1993) (citingGossett v. Twin County Cable T.V., Inc., 594 So.2d 635 (Ala. 1992)).
Jason argues that the partial summary judgment for the defendants must be reversed because, he says, his claims in the first category, i.e., those claims not based on the Act, are not barred by the exclusivity provisions of the Act. The trial court gave no rationale for the partial summary judgment. However, the parties submit, and we agree, that the only rationale sufficient to support the partial summary judgment as to all of Jason's claims that seek relief in tort is the trial court's determination that the exclusivity provisions of the Act barred those claims. Accordingly, we first consider whether that determination is correct.
In pertinent part, § 25-5-53, Ala. Code 1975, sets out the exclusivity provisions of the Act:
 "The rights and remedies granted in this chapter to an employee shall exclude all other rights and remedies of the employee, his or her personal representative, parent, dependent, or next of kin, at common law, by statute, or otherwise on account of injury, loss of services, or death. Except as provided in this chapter, no employer shall be held civilly liable for personal injury to or death of the employer's employee, for purposes of this chapter, whose injury or death is due to an accident or to an occupational disease while engaged in the service or business of the employer, the cause of which accident or occupational disease originates in the employment."
See also § 25-5-52. Further, all lawsuits brought by employees against employers based on injuries sustained in the course of employment are presumed to be governed by the Act. Veterans ofForeign Wars Post 7320 v. Sheffield, 398 So.2d 262 (Ala. 1981);C.F. Halstead Contractor, Inc. v. Lowery, 51 Ala. App. 86,282 So.2d 909, cert. denied, 291 Ala. 775, 282 So.2d 913 (1973).
Jason asserts that this presumption and the exclusivity provisions of the Act are inapplicable to him because, he says, he was not an "employee" as that teerm is defined by the Act. Jason relies on the definition of "employee" as set out, in pertinent part, in § 25-5-1(5):
 "EMPLOYEE or WORKER. The terms are used interchangeably, have the same meaning throughout this chapter, and shall be construed to mean the same. The terms include the plural and all ages and both sexes. The terms include every person in the service of another under any contract of hire, express or implied, oral or written, including *Page 197 
aliens and also including minors who are legally permitted to work under the laws of this state, and also including all employees of Tannehill Furnace and Foundry Commission."
(Emphasis added.) Jason argues that he was not a "minor[ ] . . . legally permitted to work under the laws of this state" because the evidence shows that he did not have a work permit as required by §25-8-45(c), Ala. Code 1975. That section provides:
 "No person, firm, or corporation shall employ, permit, or suffer any person 18 years of age to work in any capacity in, about or in connection with any mine, coke breaker, coke oven, or quarry, or any person 16 or 17 years of age to work in any other gainful occupation, except in agricultural service, unless the person, firm, or corporation procures and keeps on file work permits for those minors."
The record is undisputed that Jason did not have a work permit. He argues, therefore, that he was not an employee under the Act and that the Act's exclusivity provisions do not apply to his claims against B B and Boykin.
The defendants assert that the Act specifically applies to Jason under § 25-5-34:
 "The provisions of this article and Article 3 of this chapter shall apply to employees who are minors and who have been employed in accordance with or contrary to laws regulating the employment of minors. If at the time of injury the minor was employed in violation of or contrary to the law regulating the employment or any part thereof, then the compensation shall be two times what it would be if the employment had been legal."
(Emphasis added.) Although there is no Alabama case authority exactly on point with the facts of the present case, Ivey v.Railway Fuel Co., 218 Ala. 407, 118 So. 583 (1928), is instructive. In Ivey, our Supreme Court considered the application of § 7539, Alabama Code 1923, a predecessor to § 25-5-34 that used substantially the same language concerning the application of the workmen's compensation act to minors who have been employed "contrary to laws regulating the employment of minors."
In Ivey, a minor was killed while working in a mine; his personal representative filed a wrongful-death action against the mine owners. The issue before the Court was whether the plaintiff could maintain the wrongful-death claim on the ground that the minor was excluded as an employee of the mine or whether the plaintiff's claim was controlled by the workmen's compensation law. Although there was no issue concerning the requirement of a work permit in Ivey, the plaintiff's argument to avoid the exclusivity provisions of the workmen's compensation law was substantially the same as Jason's — he asserted that the decedent was a minor under the age of 16 who could not be an employee under the workmen's compensation law because such employment was prohibited under the applicable child-labor law. In support of this argument, the plaintiff invoked § 7596(h), Ala. Code 1923, which defined "employee" under the workmen's compensation act with substantially the same language that is presently used in §25-5-1(5), as including "minors who are legally permitted to work under the laws of [this] State."
The Court rejected the plaintiff's argument in Ivey. Specifically, it determined that the more specific provisions of § 7539 took precedence over the more general terms of § 7596(h):
 "Section 7539 is an express special declaration dealing with minors alone, while the expression quoted from subdivision (h) appears in section 7596, and which said section is but a general provision defining words and phrases. Section 7539 is plain and unambiguous, and deals specially with the application of the law to minors, while subdivision (h) and the section in which it appears deals generally with many subjects, words, and phrases. It is well settled by the *Page 198 
decisions of this and other courts that, where there is a conflict in sections or provisions in pari materia, one dealing specially with a subject and the other doing so generally, the special section must prevail. `Generalibus specialia derogant.' Holloway v. Henderson, 203 Ala. 247, 82 So. 344 [(1919)]; McFountain v. State, 203 Ala. 329, 83 So. 53 [(1919)], and cases cited; Ex parte Central Iron Co., 209 Ala. 22, 95 So. 472
[(1923)]; Herring v. Griffin, 211 Ala. 225, 100 So. 202
[(1924)]. Moreover, the rule applicable to defining clauses is that they should be used only for the purpose of interpreting words that are ambiguous or equivocal and not so as to disturb the meaning of such that are plain. 36 Cyc. 1106."
218 Ala. at 409, 118 So. at 584. The Court concluded that the workmen's compensation law governed the plaintiff's rights to relief and that the wrongful-death action could not be maintained.
The Ivey case, although old, remains good law, and the statutes it interpreted remain in the Code of Alabama to this day.Accord, Larry v. Taylor, 227 Ala. 90, 149 So. 104 (1933) (stating that the workmen's compensation law applies to minors employed in violation of child-labor laws). Perhaps more critically, the principles of statutory construction used in Ivey are fully applicable to the present case.
 "`Statutes should be construed together so as to harmonize the provisions as far as practical.' Ex parte Jones Manufacturing Co., 589 So.2d 208, 211 (Ala. 1991). `In the event of a conflict between two statutes, a specific statute relating to a specific subject is regarded as an exception to, and will prevail over, a general statute relating to a broad subject.' Id."
Dollar v. City of Ashford, 677 So.2d 769, 770 (Ala.Civ.App. 1995). As in Ivey, the rule of statutory construction applied inDollar and Jones supports the conclusion that the application of the specific reference to minors employed contrary to the law in §25-5-34 controls over the more general reference to "employees" in25-5-1(5).
We note further that § 25-5-1(5) states that the term "employee" includes "minors who are legally permitted to work," but makes no reference or exclusion concerning minors who work without legal sanction. Generally, the term "include" or "includes" is a term of enlargement rather than restriction or a term that supplies a partial list without limitation. See Prince v. Higgins,572 So.2d 1217 (Ala. 1990); Black's Law Dictionary at 766 (7th ed. 1999). Finally, we note that the interpretation of "employee" asserted by Jason would essentially negate the provision in § 25-5-34
concerning minors who are employed "contrary to the law," whereas recognizing the specific application of that language has no comparable effect on § 25-5-1(5). The construction espoused in Ivey gives both statutes a plain field of operation.
We therefore conclude that the Act is applicable to Jason and that its exclusivity provisions bar his claims against the defendants made outside of the Act. As the Court in Ivey
stated:
 "We think quite clearly our Legislature has brought within the Alabama Compensation Law cases of minors employed in violation of the Child Labor Law. Whether this is a wise or just policy is for the Legislature."
218 Ala. at 409, 118 So. at 585.
Because we conclude that the exclusivity provisions of the Act operate to bar Jason's claims made outside the Act, the partial summary judgment is due to be, and it is hereby, affirmed. This conclusion renders unnecessary any consideration of the issue of estoppel.
AFFIRMED.
YATES, MONROE, CRAWLEY, and THOMPSON, JJ., concur. *Page 199